NATIONAL ASSOCIATION OF AMERICAN CHURCHES,[1]
PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE,
RESPONDENT

Docket No. 29251–81X.    Filed January 5, 1984.

*William W. Lentz* and *Denis H. Hare,* for the petitioner.
*Keith A. Aqui,* for the respondent.

SWIFT, *Judge*: This is an action for declaratory judgment pursuant to section 7428.[2] Petitioner filed an application with the Internal Revenue Service for recognition of exemption from Federal income taxes on March 11, 1980, seeking exemption under section 501(c)(3) and claiming to be a church within the meaning of section 170(b)(1)(A)(i). The application was filed as a group ruling request under Rev. Proc. 80–27, 1980–1 C.B. 677, seeking a determination of exempt status for petitioner and 72 affiliated missions.

After extensive efforts by respondent at the administrative level to obtain detailed factual information from petitioner

---

[1]Petitioner alleges in its brief to have changed its name to "Churches of Christ in Zion" subsequent to filing its petition herein. However, no motion to change the name of petitioner under Rule 63, Tax Court Rules of Practice and Procedure, was filed with the Court.

[2]All section references are to the Internal Revenue Code of 1954 as amended and in effect during the years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure, unless otherwise indicated.

concerning the activities, operations, and financial affairs of petitioner and of its affiliated missions, respondent, on June 17, 1981, issued an adverse ruling. Therein, respondent determined that petitioner was not operated exclusively for exempt purposes, that it was operated for private rather than public interests, and that petitioner was not a church within the meaning of section 170(b)(1)(A)(i). With regard to the affiliated missions, respondent concluded that a group ruling request would not be appropriate since various requirements of Rev. Proc. 80–27, 1980–1 C.B. 677, had not been satisfied. In the adverse ruling of June 17, 1981, respondent also described much of the information provided by petitioner at the administrative level as vague, unresponsive, and ambiguous.

On July 8, 1981, petitioner filed a protest of the June 17, 1981, ruling. On September 3, 1981, respondent issued a final adverse ruling, which stated in relevant part as follows:

You are not operated exclusively for exempt purposes within the meaning of section 501(c)(3) of the Code. You are operated in furtherance of a substantial non-exempt purpose. You are operated to serve private rather than public interests. Also, you have failed to establish that no part of your net earnings inures to the benefit of private individuals. Furthermore, even if you were described in section 501(c)(3), you would be a private foundation because you are not a church within the meaning of section 170(b)(1)(A)(i), the only basis upon which you seek nonprivate foundation status.

Prior to a discussion of the administrative record and the relevant legal precedents, it would appear helpful to review briefly the history and nature of a declaratory relief action under section 7428 and the scope of this Court's jurisdiction in such an action. In *Houston Lawyer Referral Service v. Commissioner*, 69 T.C. 570, 573 (1978), a Court-reviewed opinion, this Court explained the history of section 7428 as follows:

Prior to the adoption of section 7428, added by section 1306, Tax Reform Act of 1976, 90 Stat. 1717, taxpayers, whose applications for exempt status under section 501(c)(3) were denied, had no judicial recourse for the review of an adverse Internal Revenue Service ruling except in the context of a deficiency proceeding in this Court or a tax refund suit in a district court or the Court of Claims. In two cases decided in 1974, *Bob Jones University v. Simon*, 416 U.S. 725 (1974), and *Alexander v. "Americans United" Inc.*, 416 U.S. 752 (1974), the Supreme Court commented extensively on the hardship cast upon such organizations by the delay in obtaining a final judgment in these types of court actions. To provide a more appropriate remedy, section 7428 was enacted conferring jurisdiction on this Court along with the United

States Court of Claims and the United States District Court for the District of Columbia to enter declaratory judgments as to the status of organizations claiming tax exemptions under section 501(c)(3).

As explained further in that opinion, the scope of this Court's review in a declaratory relief action of respondent's administrative decisions is narrow and is limited to a review of "the legal issues raised by the Internal Revenue Service's denial of an exemption ruling on the basis of uninvestigated statements of facts submitted by the taxpayer in its ruling request and related papers." 69 T.C. at 573.

Generally, in a declaratory relief action, factual assertions contained in the administrative record are taken as true. See *Houston Lawyer Referral Service v. Commissioner, supra* at 577, and this Court's Notes accompanying Rules 213(a) and 217(a), 64 T.C. 1177, and 68 T.C. 1042, respectively. However, factual inferences may be drawn from the administrative record by this Court in the performance of its review function, and in some limited circumstances an evidentiary hearing may be appropriate. See Tax Court Note to Rule 217, 64 T.C. 1179; *Houston Lawyer Referral Service v. Commissioner, supra* at 575; and *Animal Protection Institute, Inc. v. United States*, docket No. 609–77 (Ct. Cl. Trial Div. 1978, 42 AFTR 2d 78–5850, at 78–5853, 78–2 USTC par. 9709, at 85374). Based upon these Rules which govern this Court's review of the administrative record in a declaratory relief action, we now proceed to summarize those facts contained in the administrative record herein which are considered relevant to the issue presented.

## *The Administrative Record*

Petitioner filed its articles of incorporation with the secretary of state of the State of Missouri on December 28, 1979. The articles state, inter alia, that the corporation is a church and that it will not carry on any activities not permitted to be carried on by a corporation exempt from Federal income tax under section 501(c)(3).

The initial registered office of petitioner was, and is, located at 2701 South 291 Highway, Independence, Mo. This is a two-story commercial building which was donated to one of the family missions and which is now used by petitioner. It is not

used as a residence for members of petitioner but is used for planning meetings, educational classes, and occasional worship services. The incorporators and board of directors of petitioner are unrelated individuals all of whom reside in close proximity to Independence, Mo. The articles of incorporation provide that upon dissolution, all assets, after payment of liabilities, shall be disposed of exclusively to exempt organizations. The articles also provide that no part of the earnings of the corporation shall inure to the benefit of any private individual except for the payment of reasonable wages and expenses.

Petitioner's rudimentary religious beliefs appear to be somewhat similar to those of the Reorganized Church of Jesus Christ of Latter-Day Saints, the headquarters of which also is located in Independence, Mo. Petitioner's tenets and beliefs were summarized in its articles of incorporation as follows:

We believe in God the Eternal Father, Who only is Supreme; Creator of the universe; Ruler and Judge of all; unchangeable and without respect of persons.

We believe in Jesus Christ the manifestation of God in flesh, who lived, suffered and died for all mankind; whom we own as our only Leader, Witness and Commander.

We believe in the Holy Ghost, the Spirit of Truth, the Comforter, which searcheth the deep things of God, brings to our minds things which are past, reveals things to come and is the medium by which we receive the revelation of Jesus Christ.

We believe that men will be punished for their own sins and not for Adam's Transgression, and that as a consequence of the atonement of Christ "all little children are alive in Christ, and also all they that are without law. For the power of redemption cometh on all them that have no law; wherefore, he that is not condemned, or he that is under no condemnation, cannot repent."

We believe that through the atonement of Christ all men may be saved by obedience to the laws and ordinances of the Gospel.

We believe in the literal second coming and millennial reign of Jesus Christ, in the resurrection of the Dead, and in Eternal Judgment; that men will be rewarded or punished according to the good or evil they may have done.

We believe that in the Bible is contained the Word of God and contains the "fullness of the Gospel".

We believe in the principle of continuous revelation, that the canon of scripture is not full, that God inspires men in every age and among all people, and that he speaks when, where and through whom He may choose.

We believe that where there are three or more members, there the Church exists with full power of Church extension when acting in harmony with the law of God.

We believe the church is a theocratic democracy—not man-made, but of divine appointment and origin. It is brought into being by command of God, is guided and administered by His authority, is sustained by the light of His Spirit, and exists for His purposes; but notwithstanding the primary rights of Divinity in His church, our heavenly Father has committed to man an important share in the responsibility of governing His church.

The government of the church is by divine authority through priesthood. Administration is through members of the priesthood, acting according to their several callings and with the consent of the church * * *

Petitioner's primary religious activities were described in its application for recognition of exemption as follows:

a. spiritual and temporal stewardship ministry programs;
b. family enrichment ministry programs;
c. readings of the Bible to gain a new insight in the life of Jesus Christ ministry programs;
d. Social fellowship ministry programs;
e. attitude awareness, positive relationships ministry programs;
f. Ministry to the sick visiting ministry programs;
g. Ministry of friendly visiting ministry programs;
h. Ministry of converting people to Christ.

At the initial organizing meeting on December 24, 1979, individuals were elected to the following leadership offices of petitioner:

President-National Pastor
Assistant-National Pastor
Secretary-Clerk
Presiding Bishop

An ambitious initial budget was adopted at the organizing meeting of $1,169,000. Funds were to be raised primarily from donations from members. Plans were adopted for formation of a National Prayer Worship Tower Ministry.

Petitioner was preceded by, and is affiliated with, an organization referred to as Continental College which shares the premises of 2701 South 291 Highway, Independence, Mo. Although the faculty, student body, and curriculum of Continental College are not clear from the administrative file, the college apparently is separately incorporated as an education-

al institution and was intended to serve as the vehicle for religious education of petitioner's lay membership.

Membership in the petitioner's organization is to consist primarily of local church missions with the result that petitioner becomes an "association of churches." (Exhibit A(d), pp. 1–2.) The local missions consist of individual families which incorporate and purport to qualify as churches under State and Federal laws. As described in the minutes of the organizing meeting—

In approaching organization of local family church members the following factors are considered:

a. Where there are three or more church members, the church exists with full power of church extension.

b. With the aim of exempting church members and local family church mission officials from individual legal liability from debts or other obligations of the local family church mission, the local members should take advantage of the religious (non) not for profit corporation law of the State and incorporate the local family church mission.

c. In order to better identify each local family church mission with each other, each local family church mission should incorporate under any style corporate name of their choice.

d. Each local family church mission shall be an extension of NATIONAL ASSOCIATION OF AMERICAN CHURCHES.

e. The local family church mission should govern their own temporal affairs and general church officials should not dominate or interfere in the temporal affairs of the local family church mission. On invitation, such general church officers may, with propriety, give counsel and assistance on spiritual affairs of the local family church mission.

f. Every local family church mission shall have a pastor, treasurer, and secretary as its local officials as well as a Board of Directors.

g. Each local family church mission member is a steward under God and answerable to Him, not only for the distribution of accumulated wealth, but to bring men to a realization of the common Fatherhood and the universal brotherhood of man in all the affairs and expressions of life, and responsible to maintain such social adjustments that each may enjoy the bounty and gifts of God, and be free to exercise his talents and abilities to enrich the life of all.

Also, in a letter of September 8, 1980, petitioner described its family based membership as follows:

Any member who places his home in order, establishes an altar, performs sacredotal and worship rites, and is duly commissioned as a chaplain by National Association of American Churches, is considered to be operating a mission of our central organization which is itself described under Sec. 170(b)(A)(i).

Among petitioner's activities, a significant one is the provision of assistance to family units to incorporate and to obtain tax exemption. Petitioner's April 17, 1980, letter states that— "The members are requested to incorporate into Missions that have small prayer circle unites [sic] within the missions." In petitioner's letter of September 8, 1980, the benefits provided by petitioner, including its incorporation advice and tax representation to the family missions, are described as follows:

Our central organization provides the following benefits for our subordinate units:
(1) Uniform Articles of Incorporation.
(2) Uniform By-Laws.
(3) I.R.S. Representation for Recognition of Exemption purposes.
(4) Legal staff should court action be necessary in seeking exempt status.
(5) Seminary fascilities [sic].
(6) News letter services.
(7) Credentials for clergy.
(8) Eccliastical [sic] recognition.
(9) Worldly wisdom for administrative purposes and policy.
(10) A series of courts for the interpretation of Canon Law.
(11) The National Prayer Tower program.
(12) Dissemination Materials.

Petitioner highlights the qualifications of a number of its faculty members at Continental College as enrolled to practice before the Internal Revenue Service. (Exhibit U, p. 2.)

Each family mission is to elect its own officers and ministers which election automatically qualifies the persons for receipt of ministers' ordinations in petitioner's organization. (Exhibit A(d), p. 10.) Seventy-two local family missions have affiliated with petitioner on the above basis. A list of the local units is provided in Exhibit I. Of the 72, 40 have submitted authorization documents to be included in the group ruling request. (Exhibits H(a)–H(au).) Copies of sample incorporation documents which petitioner makes available to the family missions are found in the administrative file in Exhibits J(a) and J(b).

The concept of stewardship to God over all which one possesses appears to be a fundamental part of petitioner's religious tenets and, as it is applied at the level of the local family missions, this tenet apparently anticipates that the incorporated family units will come to own and possess all temporal wealth of the family members. (Exhibit A(c), sec.

XVIII, par. g.) As stated in petitioner's letter to respondent of September 8, 1980—

Briefly, a steward is a being who considers everything in his possession to belong to God. The steward therefore possesses all of his temporalities in trust for his principal the creator. Proper amplification on the subject of stewardship is a religious treatise of its own.

It is not clear whether it is this principle of stewardship or mere tax-avoidance motives which cause the transfer of personal property of family members to the respective locally incorporated family missions. However, it is clear that to the extent the family missions qualify for tax-exempt status as churches or to the extent they are treated as being tax exempt, the potential for the missions to be used as improper tax-avoidance vehicles is obvious.

Documents submitted by petitioner and contained in the administrative file appear to be carefully drafted to avoid any direct admission that petitioner instructs or advises its members to transfer personal assets to the incorporated family missions, to claim charitable tax deductions with respect to any such transfers, to claim an exclusion from taxable income for personal wages transferred to the family missions, or to claim as nontaxable the payment by the family missions of family living expenses. Indeed, to the extent there are specific references in the administrative file as to the involvement of petitioner in the financial and tax affairs of the local family missions, the references disclaim petitioner's influence and jurisdiction over such matters. The Application for Recognition of Exemption (Part III, C(4)) states that "each church mission is in charge of its own temporal ministries." In a letter of April 17, 1980 (p. 2, par. 11), petitioner stated that "At this time most missions do not have the investment funds to pay ministers. The ministers pay their own keep from their own private funds." In response to a question as to whether members take a tax deduction for transfers of property to family churches, petitioner stated as follows (Exhibit U, pp. 4–5, par. 5):

Whether [donors] take a past or future tax deduction on any personal or corporate return is a matter of conjecture, inasmuch as we do not know if such donor will file an itemized return or claim only the standard deduction. Inasmuch as the Church is not a tax return preparer, we will advise donors

to follow the dictates of the Internal Revenue Code, and if that code and its companion regulations are not understood, to seek competent advice from a preparer, enrolled agents, or attorney. We are in no position to leap to a conclusion, and in fact your question violates the rules of evidence touching upon conclusions. It is our understanding the donor cannot take a deduction for properties transferred where the donor continues to use such property in a personal capacity. We recommend that our people render unto Caesar what is Caesar's, and to render unto God what is God's. We demand that you confine the scope of your inquiry to the subject of National Association of American Churches and not wander into matters of sheer speculation, foreign organizations or persons outside the corporate confines of National Association of American Churches.

However, in its second amended petition herein, petitioner acknowledged that it "promotes seminars which disseminate free information to the public concerning the financial and tax aspects of churches." (Second amended petition, par. 4(h).)

In contrast to the disclaimers that petitioner advises the transfer of personal assets to the family missions in order to obtain tax benefits, the financial information which petitioner submitted to respondent pertaining to the assets of four of the family missions raises contrary inferences. That information is included in the administrative file at Exhibits N through R. Each of these exhibits raises very serious questions as to the nature of the contributions and expenses, as to the qualifications of the family churches for tax-exempt treatment and, most significant to this case, as to the nature of petitioner's advice to the family missions. In summary format, some of the questionable items reflected in the documents pertaining to the four family missions with respect to which financial information was submitted are reflected below:

*Rev. Eugene Whelan Ministries (Exhibit N)*

| | |
|---|---:|
| Contributions | $62,082.87 |
| Expenses: | |
| Parsonage allowance | 3,074.52 |
| Insurance | 472.42 |
| Gasoline | 1,893.38 |
| Electric utility | 660.18 |

*Ralph F. Powell Ministries Inc. (Exhibit O)*

| | |
|---|---|
| Contributions | $32,375.00 |
| Expenses: | |
| Chapel | 3,000.00 |
| Transportation equipment | 7,500.00 |
| Mission equipment | 2,500.00 |
| Chapel mortgage | 12,000.00 |
| Mortgage transportation equipment | 6,500.00 |

*Council for Betterment Inc. (Exhibit P)*

| | |
|---|---|
| Contributions | $20,750.00 |
| Expenses: | |
| Missionary transportation equipment | 7,300.00 |

*Counsel of Family Ministry (Exhibit Q)*

| | |
|---|---|
| Contributions | $182,136.20 |
| Expenses: | |
| Finance building | 11,000.00 |
| Ministry operating expenses | 1,331.43 |

Upon receipt of the above information, respondent inquired by his letter of October 9, 1980, as follows:

In our letter dated May 28, 1980, we asked whether any individual or corporation has or will claim on his, her or its tax return any deduction for any past, present or expected transfer of land, building, [or] house to your corporation. Your answer that "you do not own land" was not responsive. Please indicate whether any individual or corporation has or will claim any deduction on any tax return for a *past, present* or *expected* transfer of *personal* property or *real* property to you *or* to your missions. Will any such donor continue to use the donated item? [Emphasis in the original.]

Petitioner's ambiguous response (found in Exhibit U, p. 4, par. 5) was previously set out herein (*supra* at pp. 25–26). Respondent asked further specific questions about some of the controversial information pertaining to each of the family missions but petitioner in each instance replied "We will require additional time to make inquiry and submit the reports." (Exhibit U, p. 10, pars. 19(a)–(n).) At no time was additional information submitted.

OPINION

To qualify for exemption under section 501(c)(3),[3] petitioner must show (1) that it is organized and operated exclusively for religious or charitable purposes (i.e., it must meet the "organizational" and "operational" tests), (2) that no part of its earnings inures to the benefit of a private individual or shareholder, and (3) that no substantial part of its activities consists of the dissemination of propaganda or attempts to influence legislation or participation in political activities. Sec. 1.501(c)(3)–1, Income Tax Regs. Petitioner would appear to meet the organizational test of section 501(c)(3) in that its articles of incorporation limit the purposes of the organization to one or more exempt purposes, do not empower the organization to engage in activities which are not in furtherance of one or more exempt purposes, and limit the distribution of assets upon liquidation to qualifying tax-exempt organizations. Sec. 1.501(c)(3)–1(b)(1)(i), Income Tax Regs.

However, an organization must also satisfy the operational test of section 501(c)(3) to qualify for tax exemption. Sec. 1.501(c)(3)–1(a)(1), Income Tax Regs. *Levy Family Tribe Foundation v. Commissioner*, 69 T.C. 615, 618 (1978). That test provides that an organization must be operated exclusively for exempt purposes. The term "exclusively" does not mean solely or absolutely without exception. *Church in Boston v. Commissioner*, 71 T.C. 102 (1978). The exclusivity requirement was explained by the Supreme Court in *Better Business Bureau v. United States*, 326 U.S. 279, 283 (1945):

to fall within the claimed exemption, an organization must be devoted to [exempt] purposes exclusively. This plainly means that the presence of a single [nonexempt] purpose, if substantial in nature, will destroy the exemption regardless of the number or importance of truly exempt purposes.

---

[3]The text of sec. 501(c)(3) provides—

(3) Corporations, and any community chest, fund, or foundation, organized and operated exclusively for religious, charitable, scientific, testing for public safety, literary, or educational purposes, or to foster national or international amateur sports competition (but only if no part of its activities involve the provision of athletic facilities or equipment), or for the prevention of cruelty to children or animals, no part of the net earnings of which inures to the benefit of any private shareholder or individual, no substantial part of the activities of which is carrying on propaganda, or otherwise attempting to influence legislation, (except as otherwise provided in subsection (h)), and which does not participate in, or intervene in (including the publishing or distributing of statements), any political campaign on behalf of any candidate for public office.

Based upon this authority, the existence of a substantial nonexempt purpose, regardless of the coexistence of an exempt purpose, precludes an organization from qualifying under section 501(c)(3). *Copyright Clearance Center v. Commissioner*, 79 T.C. 793, 804 (1982); *Presbyterian & Reformed Publishing Co. v. Commissioner*, 79 T.C. 1070, 1082 (1982), on appeal (3d Cir., July 6, 1983). See also *Basic Bible Church v. Commissioner*, 74 T.C. 846 (1980).

A number of recent court decisions have concerned organizations which have offered, among other services, financial and tax advice to their members or the public and have addressed the question of whether such activities constitute a substantial nonexempt purpose under section 501(c)(3). In *Ecclesiastical Order of Ism of Am v. Commissioner*, 80 T.C. 833 (1983), this Court held that an organization, whose unorthodox religious doctrines were assumed to be legitimate, did not qualify for tax exemption under section 501(c)(3) because of the organization's extensive tax counseling services. In that opinion, the Court responded to the organization's claim that it was obligated to share tax information with its members with the following comment (80 T.C. 840–841):

There is a big difference between *informing* members that ministers may be entitled to special tax benefits, *as an incident* to carrying on primarily religious activities, and *suggesting innumerable* methods by which ministers can *maximize* tax benefits, which is carried on as a *substantial activity* in and of itself. [Emphasis in the original.]

In a case not involving the patently abusive situation which was present in *Ecclesiastical Order of Ism of Am*, this Court in *Christian Stewardship Assistance, Inc. v. Commissioner*, 70 T.C. 1037 (1978), held that an organization which offered tax planning advice to wealthy individuals also was engaged in a substantial nonexempt activity under the operational test of section 501(c)(3).

Prior to a discussion of whether the administrative record herein will support a finding that petitioner was not engaged in a substantial nonexempt activity, one other group of recent cases is relevant. In a number of cases within the last few years, fact situations have come before this Court which reflected efforts of taxpayers to hide behind the cover of purported tax-exempt religious organizations for significant

tax-avoidance purposes. In *Basic Bible Church v. Commissioner, supra,* a husband and wife took a vow of poverty, declared they were transferring all their family possessions, real and personal, and all their income to a charter association of the Basic Bible Church. The association was claimed to be tax exempt and many of the personal, family expenses were paid from funds of the religious association they had formed. Also, a claim was made that the husband's wages were exempt from withholding taxes under sections 3402(n) and 3401(a)(9) since he was now a licensed minister of a church and all services performed were alleged to be performed for religious services. Not surprisingly, this Court held that such an organization served the substantial nonexempt purposes of providing private financial aid to the individual family members of the association and sustained respondent's determination that the organization did not qualify for tax-exempt status.

In *Bubbling Well Church of Universal Love, Inc. v. Commissioner,* 74 T.C. 531 (1980), a family basically incorporated itself and formed a family church. Thereafter, what appeared to be significant personal expenses were paid by the claimed tax-exempt organization. This Court again sustained respondent's determination that such an organization does not qualify for tax-exempt status. *McGahen v. Commissioner,* 76 T.C. 468 (1981), affd. without published opinion 720 F.2d 664 (3d Cir., Sept. 20, 1983), involved facts almost identical to those in *Basic Bible Church v. Commissioner, supra.* Individuals within one family formed a charter of the Basic Bible Church, took a vow of poverty, and claimed tax deductions for contributions of their income to the church even though the church's funds were used to pay extensive personal, family expenses. In disallowing the taxpayer's deductions to the family church, the Court stated (76 T.C. at 479–480)—

Petitioner struggles to escape the tax liability on his individual income under section 61 and to avoid the prohibition of section 262 against decreasing the income subject to tax by amounts paid for personal, living, and family expenses by "incorporating" himself into a church, which, for all practical purposes, goes out into the secular world, earns income, and engages in temporal and business affairs. By doctrinal definition of the Basic Bible Church, petitioner attempts to transmute the commercial into the ecclesiastical and thus avoid the congressional separation of taxable individual income and tax-exempt religious order income. * * *[4]

---

[4]Similar efforts to reduce taxes, involving the incorporation of family assets by ministers of the Universal Life Church, were addressed and rejected in *Hall v. Commissioner,* T.C. Memo.

Turning to the specifics of this case, the limited financial information contained in the administrative record concerning petitioner's members raises significant questions as to whether petitioner's membership is significantly different, from a tax standpoint, from the family churches involved in *Basic Bible Church v. Commissioner, supra, Bubbling Well Church of Universal Love, Inc. v. Commissioner, supra,* and *McGahen v. Commissioner, supra.* Furthermore, the fact that petitioner's regular membership appears to follow a pattern whereby individual members attempt to convert after-tax personal and family expenses into tax deductible charitable contributions by incorporating their families as churches under State law, raises a serious question as to whether petitioner, as the central organization, is engaged in the previously discussed nonexempt activity of rendering substantial tax advice to its members. This question is not adequately answered by summary allegations in the record that personal assets needed for ordinary living expenses are not donated to the churches (Exhibit H, p. 8, par. 9) or by a self-serving disclaimer that "it is our understanding that the donor cannot take a deduction for properties transferred where the donor continues to use such property in a personal capacity" (Exhibit U, p. 5, par. 5).

The only reasonable inference from the financial information available pertaining to the local units is that a pattern exists for the donation of family assets and the payment of personal, family expenses by petitioner's family missions. Also, an admission is made in the record that the family churches do own land and buildings which are occupied as houses by the family members of the church. Based upon the above facts, it is concluded that the administrative record before us presents a fact situation at the family mission level similar to that found in *Basic Bible Church v. Commissioner, supra,* and *McGahen v. Commissioner, supra.*

Whether petitioner, as the parent or central organization of the family missions, is the provider of the financial/tax advice to the family missions, which results in the transfer of personal assets to the family missions, and whether such advice constitutes a substantial part of petitioner's activities is

1982–337; *Mustain v. Commissioner,* T.C. Memo. 1982–670; *Schilberg v. Commissioner,* T.C. Memo. 1982–336; *Riemers v. Commissioner,* T.C. Memo. 1981–456; *Kellman v. Commissioner,* T.C. Memo. 1981–615; and *Brown v. Commissioner,* T.C. Memo. 1980–553, among others.

a more difficult question in light of the content of the administrative record. As discussed above, if the answer to this question is in the affirmative, respondent's determination that petitioner did not qualify for a favorable ruling as to its tax-exempt status must be sustained. Our review of the administrative record demonstrates that petitioner has adopted basic religious tenets and that it does engage in activities which would be considered religious activities, albeit somewhat unorthodox and informal. However, the administrative record clearly reflects that petitioner provides some financial and tax advice to its members. It provides sample incorporation papers. It stated as one of its purposes the provision to its members of tax assistance in dealing with the Internal Revenue Service. It emphasizes the qualifications of some of its ministers as tax advisers and as qualified, enrolled agents to practice before the Internal Revenue Service, and it acknowl-. edges participation in tax seminars for its members.

After careful review of the entire administrative record, it is concluded that the pattern of tax-avoidance activities which appears to be present at the membership level, combined with petitioner's admitted role as a tax adviser to its members, justifies respondent's determination, for advance ruling purposes, that petitioner was engaged in a substantial nonexempt activity.

Additionally, we note petitioner's failure to respond completely or candidly at the administrative level to many of respondent's questions. In a number of instances, constitutional objections were raised to the questions. It is well established that the tax benefit granted a religious organization is not obtained as a constitutional right, but is a matter of legislative grace. *Better Business Bureau v. United States, supra; New Colonial Ice Co. v. Helvering,* 292 U.S. 435 (1934). Accordingly, an applicant for exemption as a religious organization does not have an unqualified constitutional right to determine the quality and quantity of the information it provides the Internal Revenue Service in seeking an exemption. See *General Conference of the Free Church of America v. Commissioner,* 71 T.C. 920 (1979). Similarly, the right of an organization to declare what information or questions are relevant or irrelevant in a determination of its tax-exempt status is not guaranteed by the First Amendment right of freedom of

religion. It is a well-settled principle that the right to free exercise of religion is not absolute and that indirect and incidental burdens thereon are allowable. *United States v. Lee*, 455 U.S. 252 (1982); *Johnson v. Robinson*, 415 U.S. 361 (1974); *Coomes v. Commissioner*, 572 F.2d 554 (6th Cir. 1978); *The Southern Church of Universal Brotherhood Assembled, Inc. v. Commissioner*, 74 T.C. 1223 (1980). Rev. Proc. 80–25, 1980–1 C.B. 667, 668, requires that for advance rulings to be issued to exempt organizations, activities of the organization must be described "in sufficient detail to permit a conclusion that the organization will *clearly* meet the particular requirements of the section under which exemption is claimed." (Emphasis added.)

In a number of declaratory relief actions involving adverse rulings by respondent as to the tax-exempt status of the applicants, respondent's determinations were sustained in part because of the failure of the applicants to provide full and complete information from which respondent could make a well-informed determination. In *Bubbling Well Church v. Commissioner, supra*, this Court noted that particularly where a family church is involved, an exemption application "calls for open and candid disclosure of all facts bearing on petitioner's organization, operations, and finances." 74 T.C. at 535. Adverse exempt organization rulings by respondent were also sustained by this Court in declaratory relief actions on the ground, among others, that incomplete information was provided at the administrative level in *Levy Family Tribe Foundation v. Commissioner*, 69 T.C. 615 (1978); *General Conference of the Free Church of America v. Commissioner*, 71 T.C. at 932, in which petitioner, similar to petitioner herein, was a central religious organization seeking tax exemption; and in *Basic Bible Church v. Commissioner*, 74 T.C. at 858.

In a proceeding under section 7428, petitioner bears the burden of proof to establish that respondent's determination was in error. Rule 217(c)(2) and *Basic Bible Church v. Commissioner, supra* at 855. Petitioner has not established that respondent was in error in determining, based upon the administrative record, that petitioner has a substantial nonexempt purpose or activity, and petitioner has failed to provide adequate information concerning petitioner's activities to support a favorable ruling.

In light of our decision under the operational test of section 501(c)(3), it is not necessary to address the other grounds of respondent's determination. Since a significant part of the decision herein is based on inferences drawn from the record and on petitioner's failure to submit more complete information, we note that an adverse decision in a declaratory judgment proceeding does not preclude a new exemption request in which additional appropriate data will be considered. *Houston Lawyer Referral Service v. Commissioner*, 69 T.C. at 577–578.

### Group Ruling Request

Although the administrative record and the Tax Court file in this case are not completely clear on this point, it appears that petitioner still is requesting a group ruling request for its 72 local family missions. However, in Rev. Proc. 80–27, 1980–1 C.B. 49, respondent has stated that a group ruling request will only be issued where, among other things, detailed information is submitted concerning the activities and finances of the subordinate units and where the central organization receives a favorable ruling. This position seems entirely reasonable. Detailed information was not provided in this case, and, in light of the adverse decision concerning petitioner herein, respondent was correct in denying the group ruling request for petitioner's family missions.

For the reasons set forth above, we sustain respondent's determination.

*Decision will be entered for the respondent.*